## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SUSAN PASTEUR**, individually and on behalf of all others similarly situated, | Case No.: |
| *Plaintiff,*<br>v. | **COMPLAINT – CLASS ACTION** |
| **CENTER FOR ADVANCED EYE CARE, P.A.**, a Delaware professional association, | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## CLASS ACTION COMPLAINT

Plaintiff Susan Pasteur ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Center for Advanced Eye Care, P.A. ("Defendant" or "Center for Advanced Eye Care"), and alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of herself and all other individuals similarly situated ("Class Members") against Center for Advanced Eye Care for its failure to secure and safeguard the personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of Plaintiff and Class Members.

2.      Defendant Center for Advanced Eye Care is a professional association that provides ophthalmology and eye care services at clinic locations in Pennsylvania and Delaware. In the course of providing these services, Center for Advanced Eye Care maintains and operates systems that process, store, and otherwise handle sensitive personal and health information of its patients.

3.      In the regular course of its business, Center for Advanced Eye Care is required to maintain reasonable and adequate security measures to protect the PII/PHI of individuals whose information it processes.

4.      On or about December 15–16, 2025, an unauthorized third party gained access to a legacy system maintained by Center for Advanced Eye Care and accessed files containing PII/PHI of patients whose information Center for Advanced Eye Care processed in the course of providing ophthalmology and related medical services (the "Data Breach").

5.      Center for Advanced Eye Care owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to protect their PII/PHI against unauthorized access or disclosure. Center for Advanced Eye Care breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class Members' PII/PHI from unauthorized access and disclosure. Every year, millions of Americans have their most valuable PII/PHI stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments to implement appropriate security measures to protect their customers' data.

6.      To obtain ophthalmology and eye care services, Plaintiff and Class Members were required to provide sensitive PII/PHI directly to Center for Advanced Eye Care. In the course of providing those services, Center for Advanced Eye Care collected, stored, and maintained that information on its systems. Center for Advanced Eye Care failed to adequately protect such information. Center for Advanced Eye Care had an obligation to secure the PII/PHI of Plaintiff and Class Members by implementing reasonable and appropriate data security safeguards as part of the services it provided and the relationship it established with its patients.

7.     As a result of Center for Advanced Eye Care's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII/PHI have been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII/PHI accessed here and the fact that the compromised PII/PHI is at a substantially increased and imminent risk of being sold on the dark web, consistent with the well-documented modus operandi of threat actors who target healthcare entities for precisely the type of information accessed here. This increased risk constitutes a concrete injury to Plaintiff and the Class, as they no longer have control over their PII/PHI, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

8.     Plaintiff and the Class will incur time and expenses to mitigate and monitor for misuse, potentially for years as a direct result of the Data Breach.

9.     Plaintiff brings this action on behalf of herself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Center for Advanced Eye Care to ensure that it implements and maintains reasonable data security practices going forward.

## **THE PARTIES**

10.     Plaintiff Susan Pasteur is, and at all relevant times was, an individual and citizen of the Commonwealth of Pennsylvania residing in. Plaintiff received ophthalmology services from Center for Advanced Eye Care at its Langhorne, Pennsylvania clinic and was required to provide

her PII and PHI to Defendant in connection with those services. Plaintiff received a Breach Notice dated February 19, 2026, informing her that her Private Information was compromised in the Data Breach.

11.     Defendant Center for Advanced Eye Care, P.A. ("Center for Advanced Eye Care" or "Defendant") is a professional association organized under the laws of the State of Delaware. Defendant is registered and qualified to do business in the Commonwealth of Pennsylvania as a foreign business corporation. Center for Advanced Eye Care provides ophthalmology and eye care services to patients at clinic locations in Pennsylvania and Delaware, including offices in Langhorne, Pennsylvania and Bryn Mawr, Pennsylvania, as well as Wilmington, Delaware and Middletown, Delaware. In connection with providing these services, Defendant collects, stores, and maintains the sensitive PII/PHI of its patients, including but not limited to names, dates of birth, Social Security numbers, medical information, and medical record numbers. Upon information and belief, Center for Advanced Eye Care provides services to patients across multiple states, including patients who are citizens of states other than Delaware.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the proposed Class consists of well in excess of 100 members. Minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A) because at least one member of the proposed Class is a citizen of a state different from the state of citizenship of Defendant. Specifically, Defendant is a professional association organized under the laws of the State of Delaware. Center for Advanced Eye Care provides ophthalmology services to patients across multiple states, and upon information and belief, the Class includes citizens of states other than Delaware, thereby satisfying the minimal diversity requirement.

13.     This Court has personal jurisdiction over Defendant because Defendant is registered and qualified to do business in the Commonwealth of Pennsylvania as a foreign business corporation, maintains clinic locations in this District, including in Langhorne and Bryn Mawr, Pennsylvania, and the acts and omissions giving rise to this action arise from and relate to Defendant's Pennsylvania-directed activities, including its collection and use of Plaintiff's and Class Members' Private Information in connection with services provided through its Pennsylvania clinics and the failure to implement reasonable safeguards for that information.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Defendant's collection, processing, and storage of Plaintiff's personal and medical information at its Langhorne, Pennsylvania clinic, and the receipt by Plaintiff of the data breach notice at Plaintiff's Pennsylvania residence. Venue is also proper under 28 U.S.C. § 1391(b)(1) because Defendant, as a corporation registered and qualified to do business in Pennsylvania, is subject to personal jurisdiction in this District and therefore "resides" here within the meaning of 28 U.S.C. § 1391(c)(2).

## COMMON FACTUAL ALLEGATIONS

15.     This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress Center for Advanced Eye Care's violations of their privacy rights. Plaintiff and the Class Members are current or former patients of Center for Advanced Eye Care who provided their PII/PHI to Center for Advanced Eye Care in connection with ophthalmology and eye care services. In the course of providing those services, Center for Advanced Eye Care collected, stored, and maintained this information on its computer systems, which were compromised in the Data Breach.

16.     This action pertains to Center for Advanced Eye Care's unauthorized disclosures of the Plaintiff's PII/PHI that occurred during the Data Breach. On or about December 15–16, 2025, an unauthorized third party gained access to a legacy system maintained by Center for Advanced Eye Care and accessed files containing Plaintiff's and the Class Members' PII/PHI.

17.     Beginning on or about February 19, 2026, Center for Advanced Eye Care began mailing written notice to Plaintiff and Class Members informing them that their Private Information may have been compromised in the Data Breach.

18.     By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, Center for Advanced Eye Care assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII/PHI from unauthorized disclosures.

19.     Despite recognizing its duty to do so, Center for Advanced Eye Care failed to implement security safeguards to protect Plaintiff's and the Class Members' PII/PHI.

20.     Plaintiff and Class Members will be required to take reasonable steps to maintain the confidentiality of their PII/PHI and relied on Defendant to keep their PII/PHI confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

**The Data Breach**

21.     According to the Breach Notice received by Plaintiff, on or about December 15–16, 2025, Center for Advanced Eye Care identified suspicious activity in a legacy system maintained by Center for Advanced Eye Care. The investigation revealed that an unauthorized third party had accessed the legacy system without permission. The types of information potentially accessed include names, dates of birth, Social Security numbers, medical information, and medical record numbers ("MRNs").

22.    Upon detecting the unauthorized activity, Center for Advanced Eye Care allegedly initiated a forensic investigation with the assistance of a third-party cybersecurity firm. The investigation revealed that certain patient-related files within the legacy system may have been accessed by an unauthorized actor. Center for Advanced Eye Care completed its review and finalized the list of individuals to be notified on or about February 12, 2026. Notice letters were mailed on or about February 19, 2026.

23.    From the date of discovery (mid-December 2025) to the date notification began (February 19, 2026), approximately two months elapsed. During this period, Plaintiff and Class Members were unaware that their personal information had been compromised and were unable to take steps to protect themselves from the heightened risk of identity theft and fraud.

24.    The Breach Notice did not specify detailed measures or actions taken by Center for Advanced Eye Care to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain the specific measures adopted by Defendant to prevent future incidents.

***The Data Breach was Preventable***

25.    Center for Advanced Eye Care's data security obligations were particularly important given the well-documented and substantial increase in cyberattacks targeting healthcare organizations in the years preceding the Data Breach.

26.    Had Center for Advanced Eye Care maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Center for Advanced Eye Care could have safeguarded the sensitive PII/PHI it processed. Center for Advanced Eye Care's continued reliance on a legacy system to store sensitive patient data, and its lack of security controls, are inexcusable.

27.    Center for Advanced Eye Care was at all times fully aware of its obligation to protect the PII/PHI of its patients and the risks associated with failing to do so. Center for

Advanced Eye Care knew that information of the type collected, maintained, and stored by Center for Advanced Eye Care is highly coveted and a frequent target of hackers.

28.    This exposure, along with the fact that the compromised PII and PHI is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



29.    By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[1]

30.    Stolen PII/PHI is often trafficked on the dark web. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

31.    When malicious actors infiltrate companies and copy and exfiltrate the PII/PHI that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

---

[1]  Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).
[2]  *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

32.     In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

33.     In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

34.     In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million customers was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing customer personal information."[5]

35.     In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

---

[3] Mark Rosanes, *The insurance industry cyber crime report:  recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guide s/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[4] *Id.*
[5] *Id.*
[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (Apr. 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

36.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

37.     Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

38.     The PII/PHI of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a stolen credit or

---

[7]   Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.
[8]   *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (Apr. 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-piiramifications-identity-theft-fraud-dark-web/.
[9]   Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[11]

39.    Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

40.    Moreover, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

41.    Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the

---

[10]   Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[11]  *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

[12] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN., Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

42.    Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

43.    The PII/PHI compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[14]

44.    Once PII/PHI is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit cards, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

45.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

---

[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[14] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

46.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

47.    Data breaches facilitate identity theft as hackers obtain consumers' PII/PHI and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

48.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[16]

49.    The exposure of Plaintiff's and Class Members' PII/PHI to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit from this highly private information.

**Center for Advanced Eye Care's Legal and Regulatory Obligations**

50.    Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses

---

[15] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[16] *Id.*

that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

51.     In 2016, the FTC updated its publication, "*Protecting Personal Information: A Guide for Business,*" which established guidelines for fundamental data security principles for businesses.[18] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

52.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested security methods, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[20]

53.     Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII/PHI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders

---

[17] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[18] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.p

[19] *Id.*

[20] FEDERAL TRADE COMMISSION, *supra* note 17.

resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

54.      As a provider of healthcare services, Center for Advanced Eye Care is also subject to the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), including the Privacy Rule and Security Rule at 45 C.F.R. Parts 160 and 164. HIPAA requires covered entities to implement administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and availability of electronic protected health information ("ePHI").

55.      On information and belief, the Data Breach resulted from Center for Advanced Eye Care's failure to comply with one or more of the safeguards mandated by HIPAA and FTC guidelines, including but not limited to failures to: ensure the confidentiality and integrity of ePHI; protect against reasonably anticipated threats to the security of ePHI; implement policies and procedures to prevent, detect, contain, and correct security violations; and train workforce members on security policies and procedures.

56.      Center for Advanced Eye Care's failure to employ reasonable and appropriate measures to protect its patients' Private Information constitutes an unfair act or practice in light of these legal and regulatory standards.

**The Impact of Data Breach on Victims**

57.      Center for Advanced Eye Care's failure to keep Plaintiff's and Class Members' PII and PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach—including Social Security numbers, dates of birth, and medical information—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

58.     The PII/PHI exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII/PHI to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

59.     Furthermore, malicious actors often wait months or years to use the PII/PHI obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII/PHI, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

60.     Given the unauthorized access to patient PII/PHI from Center for Advanced Eye Care's systems, many victims of the Data Breach have likely already experienced significant harm as a result, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

61.     It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial-related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[21]

62.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[22]

63.    Annual monetary losses from identity theft are in the billions of dollars.

According to a Presidential Report on identity theft produced in 2007:

In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

---

[21]IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.
[22] *Id.*

64.    The unauthorized disclosure of sensitive PII /PHI to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[23]

65.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

66.    As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

    a.    The unconsented disclosure of confidential information to a third party;

    b.    Unauthorized use of their PII without compensation;

    c.    Losing the value of the explicit and implicit promises of data security;

    d.    Losing the value of access to their PII permitted by Defendant without their permission;

    e.    Identity theft and fraud resulting from the theft of their PII;

    f.    Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

    g.    Anxiety, emotional distress, and loss of privacy;

---

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

h.   The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.   Unauthorized charges and loss of use of and access to their accounts;

j.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

k.   Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.   The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

67.   Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[24]

68.   Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would be less willing to provide personal information to organizations that have suffered a data breach.[25]

---

[24] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[25] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

69.    Plaintiff and Class Members have a direct interest in Center for Advanced Eye Care's promises and duties to protect PII/PHI, i.e., that Center for Advanced Eye Care would **not increase** their risk of identity theft and fraud. Because Center for Advanced Eye Care failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Center for Advanced Eye Care's wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class Members as close to the same position as they would have occupied but for Center for Advanced Eye Care's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII/PHI.

70.    Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through Center for Advanced Eye Care's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII/PHI is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

71.    Plaintiff and Class Members have an interest in ensuring that their PII/PHI is secured and not subject to further theft, as Defendant continues to hold their PII/PHI.

**Plaintiff Susan Pasteur's Experience and Injury**

72.    Plaintiff Susan Pasteur is a patient of Center for Advanced Eye Care in Langhorne, Pennsylvania. As a condition of receiving healthcare services, Plaintiff provided Defendant with her Private Information, including her name, Social Security number, date of birth, and medical information.

73.    Plaintiff provided her Private Information to Center for Advanced Eye Care and trusted that Defendant would use reasonable measures to protect it in accordance with applicable law and industry standards.

74.    On or about February 19, 2026, Plaintiff received a Breach Notice from Center for Advanced Eye Care informing her that her Private Information may have been compromised in the Data Breach.

75.    As a result of the Data Breach, Plaintiff will be required to spend considerable time and effort monitoring her financial accounts, credit reports, and explanation of benefits statements to detect unauthorized activity; researching how to prevent, detect, and recover from identity theft and fraud; and taking other reasonably necessary mitigation steps, including but not limited to reviewing and placing fraud alerts and credit freezes, changing passwords and security questions, and enrolling in credit monitoring services. Such time and effort have been and will be lost and cannot be recaptured.

76.    Plaintiff has suffered actual injury including but not limited to: (a) an increased and imminent risk of identity theft and fraud resulting from the compromise of her Social Security number and date of birth; (b) the loss of privacy in her Private Information; (c) the loss of the benefit of the bargain she struck with Defendant when she provided her Private Information as a

condition of receiving healthcare services; (d) the diminution in value of her Private Information; and (e) time and effort reasonably necessary to mitigate the consequences of the Data Breach.

77.     Plaintiff has a continuing interest in ensuring that her Private Information, which upon information and belief remains in Defendant's possession, is adequately protected and safeguarded from future unauthorized access.

**Plaintiff and the Proposed Class Face an Ongoing Risk of Harm**

78.     The compromise of Social Security numbers and dates of birth creates a particularly acute and long-lasting risk of identity theft because these identifiers are effectively permanent. Unlike a credit card number that can be cancelled and reissued, a Social Security number cannot be changed absent extraordinary circumstances, and a date of birth is immutable.

79.     Cybercriminals can combine stolen names, Social Security numbers, and dates of birth with other data obtained from publicly available or separately compromised sources to assemble comprehensive identity profiles (commonly known as "Fullz" packages), which are then sold on illicit markets and used to perpetrate identity fraud, open unauthorized financial accounts, file fraudulent tax returns, and commit other forms of misuse.

80.     It can take years for victims to discover that their identities have been compromised, during which time criminals may use stolen Private Information repeatedly and in multiple ways.

81.     As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered or are at an increased risk of suffering:

    a.   The loss of the opportunity to control how their Private Information is used;

    b.   The diminution in value of their Private Information;

    c.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

     d.   Lost opportunity costs and wages associated with time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach;

     e.   Unauthorized use of their Private Information; and

     f.   The continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized access so long as Defendant fails to implement adequate security measures.

## CLASS ACTION ALLEGATIONS

82.    Plaintiff brings this action on behalf of herself and all other persons similarly situated as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following class ("Nationwide Class"):

**Nationwide Class**
All individuals in the United States whose personally identifiable information and/or protected health information was compromised as a result of the data breach discovered by Defendant on or about December 15–16, 2025 and announced by Defendant on or about February 19, 2026.

83.    Plaintiff also seeks to represent the following subclass ( "Pennsylvania Subclass"):

**Pennsylvania Subclass**
All members of the Nationwide Class who are residents of the Commonwealth of Pennsylvania and/or whose personal information was collected by Defendant at its Pennsylvania clinic locations.

84.    Excluded from the Nationwide Class and Pennsylvania Subclass are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the Judge to whom this case is assigned, and any person within the third degree of relationship to that Judge, and the heirs, successors, and assigns of any such excluded person.

85.    Plaintiff reserves the right to amend the Class definition as appropriate based on discovery and further investigation.

86.    ***Numerosity.*** Upon information and belief, the Nationwide Class is so numerous that joinder of all members is impracticable. Center for Advanced Eye Care provides ophthalmology services at multiple clinic locations across Pennsylvania and Delaware and

processes the PII/PHI of a large number of patients. The exact number of Class Members can be readily ascertained through Defendant's records, but upon information and belief consists of many thousands of individuals.

87.     ***Typicality.*** Plaintiff's claims are typical of the claims of the Members of the proposed Nationwide Class. All Class Members were subject to the Data Breach and had their PII/PHI accessed by and/or disclosed to unauthorized third parties. Center for Advanced Eye Care's misconduct affected all Class Members in the same manner.

88.     ***Adequacy.*** Plaintiff is an adequate representative of the proposed Nationwide Class because her interests do not conflict with the interests of the other Class Members she seeks to represent; she has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the proposed Nationwide Class will be fairly and adequately protected by Plaintiff and her counsel.

89.     ***Commonality and Predominance.*** Common questions of law and fact predominate over any individualized questions and include, but are not limited to:

    a.  Whether Defendant had a duty to protect Plaintiff's and Class Members' PII/PHI;

    b.  Whether Defendant's security measures were reasonable;

    c.  Whether Defendant failed to implement adequate safeguards;

    d.  Whether Defendant's conduct was negligent;

    e.  Whether Defendant's notification to affected individuals was timely and adequate;

    f.  Whether Plaintiff and Class Members suffered legally cognizable damages as a result of the Data Breach; and

    g.  Whether Plaintiff and Class Members are entitled to injunctive and equitable relief.

90.    *Superiority.* A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Center for Advanced Eye Care, making it impracticable for Class Members to individually seek redress for Center for Advanced Eye Care's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, increasing the delay and expense for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION
### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class)**

91.    Plaintiff realleges paragraphs 1 through 90 as if fully set forth herein.

92.    Plaintiff brings this claim individually and on behalf of the Class.

93.    To obtain ophthalmology and eye care services, Plaintiff and Class Members were required to provide non-public personal and health information to Center for Advanced Eye Care. Plaintiff and Class Members are current or former patients of Center for Advanced Eye Care who entrusted their sensitive PII/PHI to Center for Advanced Eye Care in connection with those services. That information was collected, stored, and maintained by Center for Advanced Eye Care as part of its operations, and Plaintiff and Class Members reasonably expected Center for Advanced Eye Care to safeguard their information consistent with its legal and contractual obligations.

94.    By collecting, storing, sharing, and using individuals' data on the Defendant's computer network for commercial gain, Center for Advanced Eye Care owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII/PHI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII/PHI in Defendant's possession was adequately secured and protected.

95.    Defendant owed a duty of care to Plaintiff and Class Members to maintain data security according to industry standards and other relevant requirements. Defendant was also responsible for ensuring its systems, networks, and personnel adequately protected the Private Information.

96.    Defendant's duty of care to use reasonable security measures arose from the relationship between Center for Advanced Eye Care and Plaintiff and Class Members, who entrusted their sensitive PII/PHI to Center for Advanced Eye Care in connection with ophthalmology and eye care services. This duty is recognized by applicable laws and regulations, including but not limited to HIPAA, as well as common law principles requiring reasonable care in safeguarding confidential information. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from a Data Breach.

97.    An entity that collects and stores individuals' sensitive personal information on internet-accessible computer systems owes a common-law duty to exercise reasonable care to protect that information from unauthorized access. This duty exists independently of any contractual obligation between the parties. Center for Advanced Eye Care's collection, storage, and maintenance of Plaintiff's and Class Members' PII/PHI on its computer systems gave rise to precisely this duty.

98.     Defendant's duty was to implement reasonable security measures under HIPAA to safeguard confidential data from both intentional and unintentional use or disclosure. This included establishing appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information, as required by 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and related information involved in this case qualifies as "protected health information" according to the relevant definition of HIPAA.

99.     In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

100.    HIPAA's administrative, technical, and physical safeguard requirements, and the FTC's published guidance regarding reasonable data security practices, are relevant to and inform the standard of reasonable care applicable to Defendant's conduct. Defendant's failure to comply with these standards is evidence that Defendant breached its common-law duty of care to Plaintiff and Class Members. Plaintiff does not assert a private right of action under HIPAA or the FTC Act, but relies on these regulatory frameworks as evidence of the applicable standard of care.

101.    Center for Advanced Eye Care breached its duties by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII/PHI.

102.    It was reasonably foreseeable that Center for Advanced Eye Care's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII/PHI would result in an unauthorized third-party gaining access to such information for no lawful purpose.

103.    As a direct result of Center for Advanced Eye Care's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' confidential

information, Plaintiff and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

104.    Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

105.    Center for Advanced Eye Care's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

106.    As a result of Center for Advanced Eye Care's above-described wrongful actions, inaction that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) the diminished value of data-security protections promised for Plaintiff's information.

//

//

//

//

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Nationwide Class)

107.    Plaintiff realleges paragraphs 1 through 90 as if fully set forth herein.

108.    When Plaintiff and Class Members provided their Private Information in connection with obtaining ophthalmology and eye care services from Center for Advanced Eye Care, and Center for Advanced Eye Care thereafter collected, stored, and maintained that information as part of its medical practice operations, Plaintiff and Class Members entered into implied contracts with Center for Advanced Eye Care under which Center for Advanced Eye Care agreed to reasonably safeguard and protect their Private Information.

109.    Plaintiff and Class Members provided valuable consideration in two forms: (a) monetary payment for ophthalmology services and related medical care, either directly or through their health insurers; and (b) their sensitive PII/PHI, which Center for Advanced Eye Care required as a condition of providing those services, and which had independent economic value to Center for Advanced Eye Care in the operation of its medical practice. In exchange, Center for Advanced Eye Care implicitly agreed to safeguard that information using reasonable data security measures.

110.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Center for Advanced Eye Care's data security practices complied with relevant laws and regulations, including HIPAA, and adhered to industry standards applicable to the protection of sensitive healthcare information.

111.    Plaintiff and Class Members would not have entrusted their Private Information to Center for Advanced Eye Care in connection with obtaining ophthalmology services in the absence of the implied contracts under which Center for Advanced Eye Care agreed to keep such information reasonably secure.

112.    Center for Advanced Eye Care breached its implied contract with Plaintiff and Class Members by failing to safeguard and protect their Private Information.

113.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

114.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

115.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring and identity protection services to all Class Members.

### COUNT III
### UNJUST ENRICHMENT
**(On Behalf of Plaintiff and the Nationwide Class)**

116.    Plaintiff realleges paragraphs 1 through 90 as if fully set forth herein.

117.    In the alternative to Plaintiff's breach of implied contract claim (Count II), Plaintiff asserts the following unjust enrichment claim.

118.    Plaintiff and Class Members conferred a benefit upon Center for Advanced Eye Care in the form of their Private Information, which Center for Advanced Eye Care collected, stored, and used in connection with ophthalmology and eye care services, with the implicit understanding that Center for Advanced Eye Care would adequately safeguard the PII/PHI entrusted to it. Additionally, Center for Advanced Eye Care received payment for medical services provided to Plaintiff and Class Members.

119.    Center for Advanced Eye Care accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class Members, including access to, use of, and reliance upon

their PII/PHI in the ordinary course of its medical practice operations. Center for Advanced Eye Care further benefited financially from providing ophthalmology and related services to Plaintiff and Class Members while retaining and utilizing their sensitive information.

120.    Center for Advanced Eye Care was unjustly enriched because it retained the economic benefit of Plaintiff's and Class Members' PII/PHI, which had independent market value, while failing to provide the data security that Plaintiff and Class Members reasonably expected. Center for Advanced Eye Care also retained a portion of the payments for medical services that was implicitly allocated to data security, which Center for Advanced Eye Care failed to provide.

121.    As a result of Center for Advanced Eye Care's conduct, Plaintiff and Class Members suffered actual damages.

122.    Center for Advanced Eye Care should not be permitted to retain monies paid to it for medical services involving Plaintiff's and Class Members' information because Center for Advanced Eye Care failed to adequately implement the data privacy and security procedures required by applicable laws and industry standards.

123.    Center for Advanced Eye Care should be compelled to provide, for the benefit of Plaintiff and Class Members, all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT IV
## BREACH OF FIDUCIARY DUTY / BREACH OF CONFIDENCE
### (On Behalf of Plaintiff and the Nationwide Class)

124.    Plaintiff realleges paragraphs 1 through 90 as if fully set forth herein.

125.    The physician-patient relationship between Center for Advanced Eye Care and its patients, including Plaintiff and Class Members, gave rise to a fiduciary duty and duty of confidence with respect to the patients' protected health information and medical records. Center for Advanced Eye Care's physicians obtained and maintained sensitive medical information,

including diagnoses, treatment information, and other clinical data, in the course of providing ophthalmology care.

126.    Patients reasonably expected and trusted that their physicians and the medical practice would maintain the confidentiality and security of their medical information. Center for Advanced Eye Care breached this fiduciary duty and duty of confidence by failing to implement reasonable security measures to protect patients' PHI, resulting in the unauthorized access to and disclosure of that information in the Data Breach.

127.    As a direct and proximate result of Center for Advanced Eye Care's breach of its fiduciary duty and duty of confidence, Plaintiff and Class Members have suffered and will continue to suffer damages as alleged herein.

## COUNT V
## DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the Nationwide Class)

128.    Plaintiff realleges paragraphs 1 through 90 as if fully set forth herein.

129.    Center for Advanced Eye Care owes a duty of care to Plaintiff and the Class, which includes a duty to implement and maintain reasonable security measures to protect PII/PHI in its possession.

130.    An actual controversy has arisen regarding Center for Advanced Eye Care's present and ongoing obligations to protect the PII/PHI of Plaintiff and Class Members. Plaintiff contends that Center for Advanced Eye Care's existing security measures are inadequate and that Center for Advanced Eye Care owes a duty to implement and maintain reasonable security measures, including but not limited to: (a) implementing and maintaining a comprehensive information security program; (b) engaging independent third-party security auditors to conduct annual security assessments; (c) implementing encryption of all PII/PHI stored on its systems; (d) implementing multi-factor authentication for access to systems containing PII/PHI; (e) providing

Plaintiff and Class Members with not less than ten years of credit monitoring and identity theft

protection services at no cost, including coverage for medical identity theft; and (f) establishing a

process by which Plaintiff and Class Members may receive timely notification of any future data

security incidents.

131.    Plaintiff and the Class will be irreparably harmed unless the Court grants the

requested declaratory and injunctive relief, because money damages alone are insufficient to

compensate them for the ongoing risk of identity theft and fraud.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class

proposed in this Complaint, respectfully request that the Court enter judgment in their favor and

against Defendant, as follows:

 a. Declaring that this action is a proper class action, certifying the Nationwide Class and Pennsylvania Subclass as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Classes;

 b. Awarding Plaintiff and the Classes appropriate monetary relief, including actual damages, statutory damages, punitive damages, nominal damages, restitution, and disgorgement;

 c. Awarding Plaintiff and the Classes equitable and injunctive relief requiring Center for Advanced Eye Care to: (i) implement and maintain a comprehensive information security program reasonably designed to protect the PII/PHI of Plaintiff and Class Members; (ii) engage independent third-party security auditors to conduct annual security assessments for a period of not less than five years; (iii) implement encryption of all PII/PHI stored on its systems; (iv) implement multi-factor authentication for access to systems containing PII/PHI; (v) provide Plaintiff and Class Members with not less than ten years of credit monitoring and identity theft protection services at no cost, including coverage for medical identity theft; and (vi) establish a process by which Plaintiff and Class Members may receive timely notification of any future data security incidents;

 d. Awarding treble damages pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2, to Plaintiff and the Pennsylvania Subclass;

e.  Awarding Plaintiff and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

f.  Awarding Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses, as allowable; and

g.  Awarding Plaintiff and the Classes such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: March 4, 2026                                        Respectfully submitted,

/s/  Andrew W. Ferich
Andrew W. Ferich (PA I.D. 313696)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel: (310) 474-9111
aferich@ahdootwolfson.com

Scott J. Falgoust*
**BRYSON HARRIS SUCIU
& DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com

Jonathan S. Mann*
**PITTMAN, DUTTON, HELLUMS,
BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 110
Birmingham, AL 35203
Tel: (205) 322-8880
jonm@pittmandutton.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiff and Proposed Class*